```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                        EASTERN DIVISION


KENNIE HOWARD, JR.,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )    No. 4:10 CV 1389 JCH
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security  )
                                 )
          Defendant.             )
```

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Kennie Howard, Jr. for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1382. For the reasons set forth below, the court reverses and remands the action for further proceedings consistent with this opinion.

## I.   BACKGROUND

Plaintiff Kennie Howard, Jr. was born on May 4, 1957. (Tr. 23.) He is 6' 5" tall with a weight that has ranged from 260 to 265 pounds. (Tr. 23.)

On January 23, 2008, plaintiff applied for supplemental security income under Title XVI of the Social Security Act. (Tr. 10, 106-08.) He alleged that he became disabled on August 31, 2006 on account of arthritis, a heart attack, panic attacks, high blood pressure, high cholesterol, diabetes, and acid reflux. (Tr. 10, 63, 106.) On May 9, 2008, defendant issued a notice of disapproved claims. (Tr. 63.) After a hearing on September 9, 2009, an Administrative Law Judge (ALJ) denied benefits on November 10, 2009. (Tr. 16, 17.) On June 22, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner subject to this judicial review.

## II. ADMINISTRATIVE RECORD

On August 17, 2006, plaintiff was a walk-in patient at Grace Hill Neighborhood Health Centers. He complained of thick urine, shoulder pain, and tingling in the hands, and feet. He stated that he smoked 5-6 cigarettes and drank 3-4 beers a day, and that he had a "slight heart attack" in 2004. He was diagnosed with diabetes, hypertension, gastroesophageal reflux disease (GERD), dyslipidemia, and a vitamin D deficiency. His EKG was normal. He had not taken any medications since November of 2005. (Tr. 213, 214.) He was prescribed medications for each of his maladies. (Tr. 216.)

On October 27, 2006, plaintiff sought treatment as a walk-in patient at the St. Alexius Hospital Emergency Department for a "breathing problem." He complained of sharp, non-radiating chest pain that began after he "did heavy lifting and working in construction." (Tr. 227.) His symptoms soon improved and he was discharged with a prescription for Ibuprofen. (Tr. 228.)

On February 27, 2007, plaintiff had a "follow-up" appointment at Grace Hill. He complained of facial pressure, DOE[1] when climbing stairs, thirst, and cold chills. (Tr. 209.) He also complained of pain in his legs, feet, chest, lower back, and shoulder. (Tr. 224.) He had not taken the medication prescribed for his diabetes since August 2006, and had not taken the prescribed treatment for his vitamin D deficiency. (Tr. 209.) His diabetes and hypertension were determined to be "uncontrolled." (Tr. 212.) He stated that he decreased his cigarette smoking to 4 cigarettes each day. (Tr. 210.)

On May 29, 2007, plaintiff had another "follow-up" appointment at Grace Hill Neighborhood Health Centers. He complained of shooting eye pain, tingling in the side of his face, chest pain and palpitations, and headaches. His limb strength was 4/5. His diabetes was noted as "improving" and his hypertension "controlled." (Tr. 205-08.)

---

[1] Dyspnea on exertion. Dyspnea is shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude. Stedman's Medical Dictionary, 480 (28th ed. 2006).

On June 1, 2007, plaintiff was admitted through the emergency room for overnight observation at St. Alexius Hospital. He complained of "chest tightness" and stated that he began a "little job" three weeks prior. He worked for only one week before he started feeling weak and, consequently, discontinued working. (Tr. 233-35.) He had "some" general weakness and a headache. However, he did not report any chest pain once in the hospital and responded well to pain medication for his "other pain." (Tr. 235, 411.) He had a negative EKG with four cardiac enzymes negative. He was diagnosed with diabetes mellitus, hypertension, hyperlipidemia, GERD, and obesity. (Tr. 234-35.) He was determined to be "feeling better clinically" and was advised to follow up with his primary physician, Dr. Angela Schiffer. He was also advised to diet, exercise, quit smoking, and continue his home medications. (Tr. 235.)

On July 3, 2007, during a follow-up appointment, plaintiff stated that he fell and injured his legs and ribs the previous week. (Tr. 335.) X-rays of his left ribs were negative. (Tr. 347.)

On August 6, 2007, plaintiff had a medical examination performed by Dr. Llewellyn Sale. Dr. Sale noted that plaintiff "is a well-developed, obese male who constantly complains of aches and pains." His blood pressure was 126/76. His muscle strength was 4/5 in the left hand grip and upper extremity, 5/5 in the right hand grip and right upper extremity, and 5/5 in the lower extremities. He stated that he had a cardiac catheter and stent placement, but could not provide additional details. (Tr. 250-52.) Dr. Sale determined that plaintiff had (1) diabetes mellitus non-insulin dependent with adequate control according to outpatient visits; (2) heart problems with possible history of myocardial infarction and stent placement; (3) high cholesterol and ongoing symptoms suggesting left ventricular insufficiency and probably New York Heart Association Class II borderline compensation; (4) multiple arthralgias and possible bursitis of his left shoulder; (5) shortness or breath, probably on a cardiac basis; (6) chronic headaches; and (7) acid reflux. (Tr. 252-53.).

On April 7, 2008, plaintiff had a medical examination performed by Dr. Sarwath Bhattacharya. Plaintiff stated that he did not have chest

pain at that time.  He noted that he occasionally took Nitroglycerin—as recently as three days prior—and did not need to take it on a regular basis.  He complained of palpitations, diaphoresis, nausea, occasional dizziness, tingling and numbness in the legs, and lower back and hip pain.  He stated that he was not currently taking pain medications for the back pain.  Dr. Bhattacharya noted that plaintiff's daily activities consisted of watching tv.  Plaintiff reported that he did not do any house work and that his sister did it for him, although he also reported doing "very light housework occasionally."  He does not exercise and does not drive.  (Tr. 259-61.)  Dr. Bhattacharya summarized plaintiff's history of present illness: (1) coronary artery disease with status post myocardial infarction; (2) Type II diabetes mellitus; (3) hypertension with no hemodynamic instability and no end organ damage related to the diabetes; (4) GERD with symptomatic relief with medication; (5) alleged back pain with no assistive device; and (6) addiction to tobacco and alcohol.  (Tr. 262-63.)  Dr. Bhattacharya also observed that (1) plaintiff appeared "in no acute distress"; (2) no heart murmurs were appreciated; (3) plaintiff had no paravertebral muscle spasm or tenderness in the back, his gait was within normal limits, he was able to walk on his heels and his toes and flex and touch his toes, he squatted only halfway down holding onto the side of the table because of knee pain, he had no difficulty getting up and down the exam table; (4) although plaintiff's condition was stable, he had multiple risk factors for a major coronary event; (5) plaintiff did not check his blood sugar on a daily basis because "he says the strips cost to much"; (6) plaintiff's blood pressure was stable; and (7) plaintiff did not use an assistive device for walking.  (Tr. 262-63.)

    On April 15, 2008, x-rays revealed mild degenerative changes of the lumbar spine without fracture and mild atherosclerosis of the abdominal area.  (Tr. 346.)  There was also little evidence of neural foraminal narrowing and no central canal stenosis.  (Tr. 271.)  On July 8, 2008, results of an MRI on the lumbar spine also indicated mild degenerative changes of the lumbar spine.  (Tr. 343-44.)  Vertebral bodies were of normal height without compression fractures.  The bone marrow demonstrated normal signal intensity on all sequences. (Tr. 343.)

On June 12, 2008, plaintiff had a physical examination and was diagnosed with neuropathy, arthritis, and diabetes. He was prescribed medication accordingly. (Tr. 318.)

On September 10, 2008, plaintiff was a walk-in patient at St. Alexius Hospital ER. He alleged abdominal pain that began "years ago." The evaluating physician noted that plaintiff appeared "comfortable" with "no apparent distress." (Tr. 405.)

On December 17, 2008, plaintiff had a treadmill nuclear stress test. He experienced fatigue and leg discomfort. His performance was considered poor for his age and gender. He did not experience chest pain with the exercise. There was no ECG evidence of ischemia during the maximum exercise stress test. Myocardial imaging showed: (1) moderate sized inferior wall ischemia and moderate sized basal anterior wall ischemia demonstrated with stress; (2) normal left ventricular size; and (3) systolic function at the lower limits of normal. (Tr. 267-69.)

On January 26, 2009, plaintiff was a walk-in patient at St. Alexius Hospital ER for complaints of hypoglycemia. Plaintiff's problem was considered "new." The symptoms improved and plaintiff was discharged with instructions on hypoglycemia and oral diabetic medicine. (Tr. 401, 402.)

On April 25 and April 27, 2009, plaintiff went to St. Alexius Hospital ER for complaints of high blood sugar. (Tr. 393, 397.) In both cases, the problem was considered ongoing. Plaintiff was prescribed medication and discharged with instructions on diabetes and hypoglycemia. (Tr. 394, 398.)

On April 20 and May 15, 2009, plaintiff had physical examinations. (Tr. 292, 318.) Neuropathy and diabetes were diagnosed and medication prescribed accordingly. (Tr. 318, 292.)

On May 23, 2009, plaintiff was a walk-in patient at St. Louis University Hospital ER. He complained of generalized fatigue and weakness, hyperglycemia, fever and chills, cough, and body-aches. (Tr. 274.) His heart was enlarged. (Tr. 283.) His symptoms improved and he was discharged with instructions on Bronchitis and Viral Illness. (Tr. 277.)

On September 3, 2009, plaintiff's sister, Margaret Daniels, completed a Function Report detailing how plaintiff's impairments limit his activities. (Tr. 196-203.) Ms. Daniels stated the following. Plaintiff cannot button his shirts or tie his shoes. He cannot climb in the tub or stand in the shower for a long period of time. (Tr. 197.) He needs assistance in shaving, brushing his teeth, and washing his face. He needs to be reminded to take his prescriptions "as prescribed only." He burns his food because he does not understand "the timing to cook." He does not do household chores. (Tr. 198.) He cannot drive or travel alone, because he experiences shortness of breath, dizziness, confusion, and panic attacks. (Tr. 199.) He cannot lift over 15 pounds and cannot walk more than a half of a block without needing a rest. (Tr. 201.) He cannot pay bills or follow written instructions because he gets confused. (Tr. 199, 201.)

On September 3, 2009, plaintiff's friend, Symonne Robinson, also completed a Function Report detailing how plaintiff's impairments limit his activities. (Tr. 188-195.) Ms. Robinson stated the following in addition to the foregoing information provided by Ms. Daniels. Plaintiff cannot fasten his pants and sometimes needs help showering and getting to the toilet. (Tr. 189-90.) He has trouble preparing meals and cannot do housework because he gets weak, tired, short of breath, and confused. (Tr. 190-91.) He cannot focus on card games or any activity that involves memory or concentration. (Tr. 192.) He experiences tingling in his right side. (Tr. 193.)

**Testimony at the Hearing**

On September 9, 2009, a hearing was conducted before an ALJ. (Tr. 17.) Plaintiff testified to the following at the hearing. His weight has ranged from 260-265 pounds because "in being sick," he was not able to "work and get around" like he normally did. He confirmed that he worked as a janitor for three and a half weeks in 2009. He last worked regularly as a dietary aide at a nursing home in 2006. (Tr. 23-25) Prior to this position, he worked as a truck driver from 2001-2006. (Tr. 27.) In 1997 and 1998, he assisted his uncle in "hauling and moving." (Tr. 28.)

Plaintiff testified that headaches, dizziness, and pain in his legs, arms, and back limit his ability "to do things." (Tr. 28.) He has vision problems relating to the headaches. (Tr. 37.) He has numbness on his side right side and tingling in his right arm, leg, and feet. He has shortness of breath, swelling in his ankles, and arthritis in his legs, hands, arms, and shoulders. He "can't remember certain things at a time" — a problem that has prevented him from renewing his driver's license. (Tr. 29, 32.) Although he is right-handed, his right hand is "not as strong as it used to be." Therefore, he now favors his left hand. He takes pain medication prescribed by his doctor for the headaches, but it does not alleviate the pain and "pretty much puts" him to sleep. He has panic attacks three to four times a week. (Tr. 29-32.) He had a "slight" heart attack in 2000. He has a heart murmur that makes his heart "flutter all the time." He has shortness of breath, and chest pain. The symptoms are particularly severe when he exerts himself. (Tr. 35, 36.)

Plaintiff also testified that his prescribed medications do not relieve any of his pain. Moreover, his medications cause side-effects consisting of diarrhea, sweating, dizziness, and nausea. (Tr. 33, 34.)

Plaintiff stated that he is "reclined all the time." During a typical day, he watches television and sleeps. (Tr. 34.) He cannot sit upright in a chair for more than three to four minutes due to his back pain. He cannot climb stairs. He can lift 5-10 pounds on a regular basis and 20-25 pounds infrequently. He occasionally takes out the trash. He does not "play on" or own a computer. He does not read the newspaper. He only leaves the house to see his doctor. (Tr. 37-40.)

### III. DECISION OF THE ALJ

On November 10, 2009, the ALJ denied plaintiff's claim for SSI benefits. (Tr. 7-16.) At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date.

At Step Two, the ALJ determined that plaintiff suffered from severe impairments of obesity; mild degenerative disc disease of the

lumbrosacral spine; Type II diabetes mellitus; and hypertension, dyslipidemia, and GERD controlled by medication.

At Step Three, the ALJ concluded that none of plaintiff's impairments, alone or in combination, meet or medically equal a listed impairment in the 20 C.F.R. Part 404, Subpart P, Appendix 1, listing of disabling impairments.

The ALJ then determined that plaintiff retained the residual functional capacity to lift or carry up to 10 pounds frequently and 20 pounds occasionally, although he could not work at unprotected heights or around dangerous machinery. In so finding, the ALJ reasoned that the record contained no documented evidence of heart disease, memory loss, mental impairments, persistent numbness, recurrent hand shaking, or of frequent dizziness, headaches, blurred vision, ankle swelling, shortness of breath, panic attacks, peripheral neuropathy, or of a myocardial infarction or stent placement.

The ALJ found no restrictions from plaintiff's hypertension or GERD, as they were well-controlled by medication, and no restrictions from plaintiff's diabetes, despite being uncontrolled, because it caused no secondary damage to his eyes, heart, brain, or kidneys.

The ALJ also found plaintiff to be not credible, given his poor work history, daily activities, and the contradictory record evidence.

At Step Four, the ALJ found that the plaintiff has no past relevant work.

At Step Five, the ALJ consulted the Medical Vocational Guidelines and determined that plaintiff retained the functional capacity, consistent with Rule 202.10, to perform a wide range of light work, which existed in substantial numbers in the national economy.

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough

that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the residual functional capacity (RFC) to perform his past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the ALJ determined that, although plaintiff had no past relevant work, he retained the functional capacity to perform other work in the national economy.

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) rejecting the opinion of Dr. Sale; (2) relying on the lack of a physician's finding of disability; (3) rejecting statements from his sister and friend; (4) assessing his neuropathy; (5) noting he did not receive regular treatment; (6) finding no evidence of heart disease; and (7) not calling a vocational expert.

**A. Dr. Sale**

Plaintiff argues that the ALJ found Dr. Sale's records ambiguous, and as a result, the ALJ should have recontacted Dr. Sale. The ALJ has a duty "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (citation omitted). A medical report is "undeveloped" when it is ambiguous or incomplete. 20 C.F.R. § 404.1512(e)(1).

The court finds the ALJ's opinion concerning Dr. Sale's report to be neither ambiguous nor undeveloped. In her report, Dr. Sale opined that plaintiff suffers from heart problems, and "probably fits New York Heart Association functional classification II." (Tr. 250-52.) These opinions, however, were based solely on medical history presented by plaintiff. (Tr. 250, 251.) Moreover, Dr. Sale found plaintiff to be "a very poor historian." Dr. Sale also appeared to find plaintiff not entirely credible, noting that plaintiff "[a]pparently" had "occasional nocturnal paroxysmal dyspnea." (Tr. 251.) Thus, the ALJ's analysis of Dr. Sale's report was legally sufficient and supported by substantial evidence.

To the extent an alternate conclusion could be drawn, remand is not required because substantial evidence supports the ALJ's treatment of the record. See Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (recognizing that the court may not reverse "merely because substantial evidence would support a contrary outcome").

**B. Lack of Physician Finding Disabled**

Plaintiff argues that the ALJ erred in considering that "[n]o doctor who has treated or examined the claimant has stated or implied

that he is disabled or totally incapacitated." (Tr. 14); see Johnson, 628 F.3d at 995 ("[A] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting the ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment.") (citation omitted); Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001). Plaintiff argues that, because none of his treating doctors were asked to render an opinion on his functional limitations, the lack of a doctor's finding of disability or incapacity cannot be held against him.

The lack of functional restrictions imposed by *any* of the claimant's physicians can be properly considered by the ALJ. Young v. Apfel, 221 F.2d 1065, 1069 (8th Cir. 2000) (holding this to be "significant"); see also Johnson v. Apfel, 210 F.3d 870, 873 (8th Cir. 2000). The ALJ may not, however, reject the opinion of a physician who was not asked about the claimant's work restrictions on the basis of the physician's silence, where other physicians imposed contrary work restrictions, or no work restrictions at all. Pate-Fires, 564 F.3d at 943; Bell v. Astrue, No. 4:09 CV 2109 TCM, 2011 WL 846179, at *14 n.12 (E.D. Mo. Mar. 8, 2011). Nor may the ALJ base his functional determination solely on the silence of the claimant's physicians. Freeman v. Astrue, Civil No. 10-2094, 2011 WL 2600636, at *3 (W.D. Ark. June 30, 2011) (noting that the claimant's doctor's silence "does not in itself constitute substantial evidence"). Thus, the ALJ may give proper consideration to the absence of work restrictions imposed by *any* of the claimant's physicians. See, e.g., Bell, 2011 WL 846179, at *14 n.12; Bunton v. Astrue, No. 4:09 CV 1914 MLM, 2011 WL 453244, at *18 (E.D. Mo. Feb. 4, 2011) ("A record which contains no physician opinion of disability detracts from claimant's subjective complaints.").

Therefore, the ALJ did not err in adversely considering the lack any of doctor-imposed functional limitations.

**C.   Third Party Statements**

Plaintiff argues that the ALJ erred in rejecting the written statements of his sister and friend. (Tr. 188-95, 196-203.) Plaintiff

argues that his sister and friend were "other sources" and entitled to at least some weight. See SSR 06-03p, 2006 WL 2329939, at *2; O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) ("The ALJ must consider observations by third parties.").

As statements from plaintiff's sister and friend, these statements were from "other sources." SSR 06-03p, 2006 WL 2329939, at *2 (categorizing siblings and friends as "other sources"). The ALJ correctly explained that, as a result, these statements were not "proof of disability." Id. ("Information from . . . 'other sources' cannot establish the existence of a medically determinable impairment."). The ALJ also correctly noted that plaintiff's sister and friend were not medically trained, and were not qualified to make clinical determinations. Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996); Ash v. Astrue, No. 2:10 CV 43 AGF, 2011 WL 2936348, at *12 (E.D. Mo. July 19, 2011). As the ALJ reasoned, plaintiff's sister and friend also had financial motivations to help plaintiff obtain benefits. Ash, 2011 WL 2936348, at *12.

Moreover, the ALJ correctly noted that the statements were inconsistent with the majority of the medical opinions and observations in the medical record. Id. Under these circumstances, the ALJ was not obligated to make additional findings before discrediting the statements of plaintiff's sister and friend. Ostronski, 94 F.3d at 419.

**D. Neuropathy**

Plaintiff argues that the ALJ erred by not considering the functional limitations of his neuropathy—tingling, numbness, and pain—when determining his RFC. Plaintiff also argues that the ALJ should have found his neuropathy to be a severe impairment at Step Two.

**1. RFC**

The ALJ concluded that there is no "documented evidence" of "peripheral neuropathy" or of "persistent numbness on either side of the body." (Tr. 13.) Although the court is uncertain as to the ALJ's intended meaning of "documented evidence," plaintiff's medical records indicate both a neuropathy diagnosis and related symptoms.

On June 12, 2008, plaintiff was diagnosed with neuropathy by a clinic physician and was prescribed medication accordingly. (Tr. 318.) On April 20, 2009, plaintiff was again diagnosed with neuropathy and was subsequently prescribed medication. (Tr. 296.) Clinic notes also indicate that: on February 27, 2007, plaintiff complained of pain in his legs, feet, chest, lower back, and shoulder (Tr. 224); on May 29, 2007, plaintiff complained of shooting eye pain and tingling in the side of his face (Tr. 205); on April 7, 2008, plaintiff complained of tingling and numbness in his legs and lower back, and hip pain (Tr. 260); on October 10, 2008, plaintiff complained of pain in his toes (Tr. 304); and on May 15, 2009, plaintiff complained of numbness and tingling in his legs. (Tr. 289.)

Therefore, the ALJ's finding that the record includes "no documented evidence of peripheral neuropathy" is not unsupported by the record. The action is remanded for the ALJ to reconsider plaintiff's RFC in light of the record evidence of neuropathy and related symptoms.

### 2. Severe Impairment: Step Two

At Step Two, the ALJ must determine whether the claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007). An impairment is severe if it limits, more than minimally, the claimant's physical or mental ability to perform basic work activities.[2] Id. at 707; 20 C.F.R. § 404.1521(a). The claimant bears the burden of proving that his impairment or combination of impairments is severe, although the burden is not onerous. Id.; Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008).

Because remand is required regarding neuropathy, on remand, the ALJ should consider whether plaintiff suffers from neuropathy and, if so, whether it is a severe impairment.

---

[2]Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

**E.  Regular Treatment**

Plaintiff argues that the ALJ erred in concluding that he did not have regular medical treatment.  In support, plaintiff asserts that treatment notes from Grace Hill Health Center indicate that he has been treated for diabetes mellitus since at least August 17, 2006.

The ALJ concluded that plaintiff "never had regular medical attention or treatment, typically only treatment for acute medical problems or alleged problems as they arise." (Tr. 14.)  However, the ALJ failed to consider plaintiff's follow-up appointments, as well as plaintiff's repeated treatment for acute medical problems. Nine of plaintiff's appointments were follow-up appointments — identified as "Chronic problem follow-up."  (Tr. 205, 209, 300, 335, 304, 308, 312, 325, 330.)  Additionally, plaintiff's "walk-in" visits on January 26, April 25, April 27, and May 23, 2009 were on account of diabetes-related issues.  (Tr. 274, 393, 397, 401.)

The ALJ's failure to consider the regularity of plaintiff's treatment in light of the entire medical record requires remand.  On remand, the ALJ should reconsider the frequency of plaintiff's treatment in light of his follow-up appointments and regular treatment for acute diabetes-related issues.

**F.  Record of Heart Condition**

Plaintiff argues that the ALJ erred in finding that "[t]here is no specific evidence of heart disease" in the record.  (Tr. 14.)

Review of the record reveals support for a heart disease diagnosis. Following medical examinations of plaintiff, both Dr. Sale and Dr. Bhattacharya noted the existence of heart problems, including coronary artery disease.  (Tr. 252, 259.)  The record also reflects complaints by plaintiff of symptoms related to or resulting from heart disease, such as hypertension, high cholesterol, palpitations, a thickened chest wall, and chest pain.  (Tr. 250, 252, 259, 262.)  Thus, the record cannot be said to be void of any specific evidence of heart disease.

"[T]he ALJ is not free to ignore medical evidence but rather must consider the whole record."  <u>Reeder v. Apfel</u>, 214 F.3d 984, 988 (8th Cir. 2000).  Upon remand, the ALJ shall reconsider whether plaintiff suffers

from heart disease and if so, to what extent his heart disease limits his functional abilities.

**G.   Vocational Expert**

Plaintiff argues that the ALJ erred in relying on the Medical Vocational Guidelines (the Grids)[3] because he suffered from neuropathy, which caused numbness, tingling, and pain in his limbs. Plaintiff argues that, because neuropathy is a nonexertional impairment, use of the Grids was improper, and testimony from a vocational expert should have been solicited by the ALJ.

At Step Five, the Commissioner bears the burden of proving that work exists in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds that the claimant has only exertional limitations, the Commissioner may meet this burden by relying on the Grids. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ determines that the claimant suffers from a nonexertional impairment, however, the ALJ may use the Grids only if "the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997); Lowry v. Astrue, No. 2:09 CV 292 MLM, 2010 WL 1221780, at *10 (E.D. Mo. Mar. 30, 2010). Otherwise, the ALJ must solicit testimony from a vocational expert. See Lucy, 113 F.3d at 908.

The court has determined that remand is required to reconsider whether the record supports a heart disease diagnosis; the regularity of plaintiff's treatment history; and to what extent plaintiff is impaired by neuropathy, if at all. On remand, if the ALJ determines that plaintiff is impaired by neuropathy, the ALJ should consider the testimony of a vocational expert instead of relying on the Grids at Step Five. Id.

---

[3]20 C.F.R. Part 404, Subpart P, App'x 2.

## VI. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of Social Security is reversed under Sentence Four of 42 U.S.C. § 405(g) and remanded for further proceedings consistent with this memorandum opinion.

Dated this 8th day of September, 2011.

                                      /s/Jean C. Hamilton
                                      UNITED STATES DISTRICT JUDGE